DETERMINED IN THE

# COURT OF ERRORS AND APPEALS

OF THE

## STATE OF NEW JERSEY,

JUNE TERM, 1897.

---

THE AMERICAN SAW COMPANY OF NEW YORK, PLAINT-
IFF IN ERROR, v. THE FIRST NATIONAL BANK OF
TRENTON, DEFENDANT IN ERROR.

THE AMERICAN SAW COMPANY OF NEW JERSEY, PLAINT-
IFF IN ERROR, v. THE FIRST NATIONAL BANK OF
TRENTON, DEFENDANT IN ERROR.

Where the facts are clear and undisputed and conclusively show lack of
authority in an agent, question as to his authority in a given particular
being the matter in issue, it is the duty of the court to determine the
issue by peremptory instruction to the jury; but the contrary is the
rule if the evidence be doubtful or conflicting as to a material fact, or
if the established facts admit of conflicting inferences determinative
of the issue.

On error to the Supreme Court.

For the plaintiff in error, *Charles L. Corbin.*

For the defendant in error, *William M. Lanning, Woodbury
D. Holt* and *Chauncy H. Beasley.*

The opinion of the court was delivered by

THE CHANCELLOR. The American Saw Company of New York was organized as a body corporate in virtue of the laws of the State of New York, in January, 1866, and from thence until 1893 carried on its business at Trenton, in this state. In January, 1893, the American Saw Company of New Jersey was organized as a body corporate under the laws of this state, and thereupon acquired the property and succeeded to the business of the American Saw Company of New York.

For convenience, the companies named will be called respectively the New York company and the New Jersey company.

Two suits, which were tried together, are here involved, in both of which the First National Bank of Trenton is the defendant. One is brought by the New York company to recover the aggregate amount of forty drafts and checks that belonged to it and were collected and paid by the defendant to one Isaac F. Bissell, between March, 1891, and the 31st of January, 1893, and the other is brought by the New Jersey company against the defendant to recover the aggregate amount of forty-nine similar instruments that were its property and were collected and paid by the defendant to Bissell, between the 31st of January, 1893, and November of the same year.

The main contention at the trial was upon the question whether Bissell had authority to receive from the bank for the companies the amounts of the checks and drafts paid by the defendant to him. That question was left to the jury by the trial judge, who refused to instruct that body to find for the plaintiffs. Error has been assigned upon such refusal, to which exception was duly taken.

It is contended that, at the conclusion of the trial, it was clear from the undisputed facts established that such authority could not be held to exist either in express terms or by implication, or by way of estoppel, and that therefore the desired instruction should have been given. Admitting the assumption of fact in this proposition to be correct, the propo-

sition is sound. Where the facts are clear and undisputed and conclusively show lack of authority in an agent, question as to his authority in a given particular being the matter in issue, it is the duty of the court to determine the issue by peremptory instruction to the jury; but the contrary is the rule if the evidence be doubtful or conflicting as to a material fact, or if the established facts admit of conflicting inferences determinative of the issue. *Newark Passenger Railway Co.* v. *Block,* 26 *Vroom* 605; *Bahr* v. *Lombard, Ayres & Co.,* 24 *Id.* 233; *Clark Thread Co.* v. *Bennett,* 29 *Id.* 404; *Montclair* v. *Dana,* 107 *U. S.* 162.

The test is whether the evidence is such that the court would set aside any number of verdicts rendered against it. *Crue* v. *Caldwell,* 23 *Vroom* 215.

The proofs before us establish that the New York company kept its bank account with the defendant for upwards of twenty years, and the New Jersey company, succeeding to the account, continued it beyond the time to which this controversy relates. Isaac F. Bissell was secretary of the New York company for many years prior and up to the time of the organization of the New Jersey company, and thereafter was secretary of the New Jersey company until November, 1893. During the entire time Bissell held the secretaryship, Samuel W. Putnam was the treasurer of the companies. In that time Mr. Putnam was also a director of both companies and for several years was vice president of the New York company and the actual manager of its business. During the years 1891, 1892 and 1893 Mr. Putnam lived at Elizabeth and Mr. Bissell lived at Trenton.

The by-laws of the New York company provided that the treasurer of that company should have charge of all the funds of the corporation and should deposit all moneys received in a bank to be designated by the trustees of the company or their executive committee, and that all checks or drafts upon those moneys exceeding $200 should be drawn by the treasurer and be countersigned by the president or a member of the executive committee of the trustees. They

also authorized the treasurer to endorse checks, drafts, &c., payable to the company for deposit to its credit.

In February, 1887, to relieve Mr. Putnam of a portion of the work he was doing for the company, the trustees adopted a resolution known in the litigation as the "Loomis resolution," which is in this language:

"WHEREAS, That inasmuch as circumstances prevent the continuous attendance at the works of the company of Mr. Samuel W. Putnam, vice president, who has hitherto acted as manager,

"*Resolved,* That Isaac F. Bissell be appointed manager of the business of the works, with full power to act in all matters in the absence of Mr. Putnam."

The practical construction given to this resolution in prosecution of the business of the company was that Bissell became manager of the business at the manufactory only, for thereafter, as theretofore, drafts upon the bank account of the corporation continued, without exception, to be made by checks signed by Mr. Putnam as treasurer, and until 1890 endorsements for deposit were all made in his name as treasurer.

The by-laws of the New York company permitted their amendment by a vote of a majority of the trustees at one of their regular meetings, provided the proposed amendment should have been considered at a previous regular meeting of the trustees.

In June, 1889, an amendment to the by-laws was proposed at a regular meeting of the trustees, which contemplated that the secretary, as well as the treasurer, might "make and endorse all checks, drafts or orders for the payment of money for deposit" in the company's bank account, and that all drafts upon that bank account should be drawn by the treasurer or president and countersigned by the secretary, and that either the secretary or treasurer could sign drafts in course of business upon the debtors of the company. This proposed amendment was not adopted, but some months after its proposal, in 1890, the secretary did commence to endorse for deposit and to countersign checks which drew moneys from

the bank and to sign drafts upon debtors in ordinary course of business.

The cashier of the defendant bank testified that, at a time he could not fix exactly, but which he thought was "probably" eight or ten years prior to May, 1896, when his testimony was given, Messrs. Putnam and Bissell came to his office in the bank, and there, in conversation, Mr. Putnam in effect stated, using the language of the witness, "that on account of impaired health he was about to be relieved of some of the duties of the office, and that Mr. Bissell would attend to those duties—to the duties of the Trenton office. He would have charge and management of the office and of its financial affairs and perform such duties as he had been performing while here. He would not be able to come over so often." The witness added that he did not understand that Mr. Putnam would give up his office as treasurer. William S. Middleton, the paying teller of the defendant, testified that, at one time, while he was at the receiving teller's window, Messrs. Putnam and Bissell came out of the cashier's room and stopped at the window where he was, and Mr. Putnam, in substance, said that he was about to leave the city for a time, and that Mr. Bissell would take charge of and attend to the financial part of the business of the American Saw Company.

The business of the company was done largely with customers at a distance from Trenton, through correspondence by mail. From 1890, in regular course of the business of the company, the secretary would open the mail matter. That matter related mainly to orders from customers for products of the manufactory and to remittances by them in liquidation of indebtedness by checks, drafts or postal orders and to remittances by banks to which drafts upon customers had been sent for collection.

Upon the orders of the customers the secretary would act by either refusing to fill them or by directing them to be filled by the proper employes of the factory, or by referring them, when of magnitude, to the executive committee of the

trustees.   He would pass the drafts, checks and postal orders received to the bookkeeper, who, after crediting the customer in each case, would enter the checks and drafts in the margin of the company's check-book and make out a deposit slip to be sent with the checks and drafts to the defendant bank and then return them to the secretary, who would print upon the back of each draft and check with a rubber stamp the words, "For deposit to the credit of the American Saw Co.," and immediately thereunder sign "I. F. Bissell, Secty.," and thereupon the checks and drafts would be taken to the defendant bank either by a clerk, the bookkeeper or Mr. Bissell.

The companies usually had more than two thousand open accounts with customers.

It was the course of business, when an order was filled, for the shipping clerk to make out a bill of the particulars of the order and submit it to the secretary, who, upon being satisfied as to its correctness, would pass it to the bookkeeper, who, in turn, would charge the amount of the bill against the customer in his account with the company, and then, after having a letter-press copy of the bill taken, would send the original bill to the customer.   On the first of each month the bookkeeper would furnish the secretary with a list of the balances of customers' accounts which were due and remained unpaid, and the secretary, exercising his discretion in the case, would either write to the customer, draw a draft upon him or allow the account to stand without action.   When he would draw upon the customer, which was a matter of frequent occurrence, he would have the bookkeeper prepare the draft and would then print upon it, where it should be signed by the drawer, with a rubber stamp, "American Saw Co.," and directly thereunder sign "I. F. Bissell, Secty." The drafts thus signed would be sent to whatever bank might be deemed a suitable collecting agent.   Many of them were sent to the defendant bank and by it to its correspondents, and its collections were invariably credited to the companies in their account with it.

When the New Jersey company was organized, its by-laws

adopted the course of the business which was then understood to be pursued by the officers, epitomized in the provision that the treasurer should have charge of all funds of the corporation under the direction of the board of directors or its executive committee; that the treasurer or secretary, or either of them, might endorse for deposit in bank; that all checks or drafts upon the bank should be signed by the president or treasurer, and countersigned by the secretary or a member of the executive committee; that the treasurer, under prescribed restrictions, should pay the obligations of the company, and that the secretary or treasurer should sign drafts upon debtors to the company.

It is observed that, in its course of financial dealing, whatever laxity in safeguard there may have been, was in the practice of putting money into the bank, necessitated by daily receipts of funds in a variety of forms. It is at the same time noticed that the drafts which were to take money out of the bank were invariably made by checks drawn by the treasurer and countersigned by another officer of the company, except, perhaps, during the time of the New York company, when they were occasionally for less than $200, and then they were signed by the treasurer. The bank had need to be but little concerned in the practice of making deposits, because in that case it was to collect the money and would have it to answer the exigencies of any irregularity, but it was very seriously interested in the authority for any practice which called for the payment out of money, because if there should be lack of authority in the drawer, loss might fall upon it beyond repair. It was in the latter line—drawing out money—that Bissell operated in the perpetration of his fraud.

In March, 1891, he received a check drawn upon a trust company of Philadelphia, for $189.20, and, without apprising the bookkeeper of its receipt, printed upon it with one of the rubber stamps alluded to, "American Saw Co.," and signed thereunder "I. F. Bissell, Secty.," and took it to the bank and requested the bank to give him the cash for it. This was in 1891, the second year after the proposed amend-

ment to the by-laws of the New York company, four years after the passage of the "Loomis resolution," and four or six years or some other considerable time after Mr. Putnam's conversation with the cashier and paying teller of the bank, during the lapse of all which time no money had been drawn from the bank for any purpose except by the treasurer's check duly countersigned, and no check or draft received from another had been endorsed to be cashed over the counter. Nor before then had any such payment over the counter ever been made. The demand offered an entirely new course of business, conspicuously at variance with, and utterly destructive of, the safeguard of the doubly-signed check, and ignorant or regardless of the treasurer's prerogatives which had theretofore been most carefully maintained. That check was paid, and, at irregular intervals thereafter within a period of two and a half years, without notice to the companies, the eighty-eight other checks in question here were likewise paid. During the same time several thousand checks were, in the usual course, deposited to the credit of the companies, and the carefully-countersigned drafts of the treasurer, for the uses of the companies, continued. When it is considered that the aggregate amount of the moneys thus had by Bissell, in two years and a half, was nearly $17,000, and that during that time the treasurer continued to draw his checks weekly for each pay-roll and all other demands upon the company, it is surprising that the defendant did not stop to inquire to what use this large amount of money was being devoted.

The proceeds of every check or draft endorsed by Bissell and cashed to him by the bank were retained by him for his own purposes. He operated with the checks of a few customers of the companies whose financial standing admitted of excuses for their apparent failure to liquidate their indebtedness, and by using his control of the course of business in the office of the companies to withhold from those customers drafts and dunning letters which would probably have led to an earlier disclosure of his methods.

The proofs make it perfectly clear that Bissell's endorse-

ment for other purposes than deposit to the credit of the companies of which he was secretary, was without express authority. The by-laws expressly circumscribed and limited his powers so as to exclude such authority and make plain the financial policy that all moneys should in the first instance be deposited in a bank to the credit of the companies respectively, and thereafter be from thence drawn for use in a prescribed manner, and that no moneys should, immediately upon receipt without deposit, be applied by any officer to the uses of the companies.

The trustees or directors were unrestricted in their general management of the affairs of the companies, but it is not perceived that they sanctioned endorsement by Bissell for purposes other than deposit. It is true that they adopted the "Loomis resolution" in 1887, but that resolution plainly was intended to give Bissell, in Mr. Putnam's absence, only the authority which he, Putnam, had theretofore, as vice president and acting manager, exercised at the manufactory. The clause of the resolution reading "with full power to act in all matters in the absence of Mr. Putnam" is controlled by the antecedent matter, and refers only to duties about the manufactory. "Language," says Mr. Justice Depue, in *Gulick* v. *Holmes*, 4 *Vroom* 470, "however general in its form, where used in connection with a particular subject-matter, will be presumed to be used in subordination to that matter, and therefore is to be construed and limited accordingly." The resolution is silent as to Mr. Putnam's powers and duties as treasurer, leaving him in sole control of them. The resolution does not admit of any other interpretation than this, and this interpretation accords with the conduct of the affairs of the corporation subsequent to the passage of the resolution. It is remembered that, for three years after the resolution was adopted, all endorsements were in the name of the treasurer, and that it was not until some months after the proposition of 1889 to amend the by-laws so that they would authorize the secretary to endorse for deposit, countersign checks and draw drafts upon debtors, that he commenced

to perform those acts. In passing it should be added that the construction of this resolution and the question whether it supported the defendant's contention were matters to be determined by the court, which should not have been left, as they were, to the jury.

It is equally clear that Bissell was not impliedly given authority to endorse otherwise than for deposit. Authority by implication could arise only from a course of dealing sanctioned by the directors. The only course of dealing in financial affairs unrecognized by the by-laws which appears to have been known to, and to have had the sanction of, the directors, was an exercise by the secretary of the powers which the proposed amendment to the by-laws sought to confer upon him—that is, endorsing for deposit, countersigning checks and drawing drafts upon debtors. It is impossible to distort such sanction into the implied bestowal of power to endorse for the purpose of immediately obtaining possession of money. Such a practice was never known to the directors or sanctioned by them. On the contrary, as has already been stated, such endorsing was in direct conflict with the practice of drawing money, which was the policy of the by-laws, and alone had the sanction of the directors.

Nor can there be found in the proofs any fact which shows that the company suffered false appearance of authority in Bissell which could have misled the defendant. The conversation between the defendant's cashier and paying teller and Mr. Putnam did not create such appearance. It related merely to the shifting of some of the duties of Putnam to Bissell. Putnam had never endorsed otherwise than for deposit, and after those conversations Bissell did not attempt to do so for years. Besides, it nowhere appears that Putnam's conversation was by authority of the trustees of the corporation or was even known to them. In January, 1893, when Bissell's course of fraud was half completed, some twenty-one promissory notes, held by the New York company, were discounted by the defendant, upon an unauthorized endorsement of them by Bissell. This circumstance is much relied upon as the

creation of a deceptive appearance of general financial powers in Bissell, but it is not perceived that it could possibly create such appearance. The proceeds of the discount went to the credit of the New York company and were drawn from it by the countersigned checks of the treasurer. The transaction put money in the bank and stands as of kin to other endorsements for deposit.

It is not claimed that there was a ratification of Bissell's conduct by silence during the time he drew the checks. It could not be so claimed, for the companies knew nothing of his procedure in that respect. *Gulick* v. *Holmes, supra.*

It is deemed that the proofs make it clear that Bissell was not authorized by the plaintiffs to receive the payments made to him by the bank which are here sued for, and hence that the request that the jury should be instructed to find for the plaintiffs should have been acceded to. It is unnecessary to pass upon the remaining assignments of error, and therefore no opinion is expressed with reference to them.

The judgments will be reversed, to the end that in each case a *venire de novo* may issue.

*For affirmance* — DEPUE, LIPPINCOTT, VAN SYCKEL, NIXON. 4.

*For reversal*—THE CHANCELLOR, CHIEF JUSTICE, DIXON, GARRISON, LUDLOW, BOGERT, HENDRICKSON. 7.