388 So.2d 1059 (1980)
JACKSON VITRIFIED CHINA COMPANY, Appellant,
v.
PEOPLE'S AMERICAN NATIONAL BANK OF NORTH MIAMI et al., Appellees.
No. 79-1837.
District Court of Appeal of Florida, Third District.
September 16, 1980.
Greenberg, Reiseman & Lamont and L. Richard Mattaway and Howard J. Levine, for appellant.
Leib & Popper, P.A. and Stephen D. Thompson, for appellees.
Before HENDRY, NESBITT and BASKIN, JJ.
HENDRY, Judge.
One Ehrlick stole from appellant approximately $120,000 in checks representing appellant's accounts receivable, and deposited them in an account which he had opened with appellee bank for the purpose of converting them into cash. The account was in appellant's name, but Ehrlick, who had falsely represented himself as the sole proprietor of the business, had sole access to the account. The deposits were effected through Ehrlick's forged endorsement of that name on the reverse side of the checks.
*1060 Approximately twenty percent of the total sum deposited had been withdrawn from the account before the fraud was discovered. All of the remaining deposits having been returned to appellant by appellee bank, the sole remaining question concerns the bank's liability, if any, to appellant, for those sums withdrawn by the forger.
The ultimate liability of appellee, which was both depositary and collector, is not at issue. Appellant's clear cause of action was against the drawee banks, under § 673.419(1)(c) (1975), UCC § 3-419(1)(c) (1962), for conversion of funds properly payable to appellant as payee. Alternatively, appellant might have brought actions against its customers, the drawers of the checks, under § 673.804, Fla. Stat. (1975), UCC § 3-804 (1962). In that event, such drawers would have had recourse to their drawee banks for improper payment on the checks, under § 674-401, Fla. Stat. (1975), UCC § 4-401 (1962). At that juncture, the drawee banks would have sued the collecting bank, appellee herein, for breach of warranties of title under §§ 673.417(2), 674.207, Fla.Stats. (1975), UCC §§ 3-417(2), 4-207 (1962). Appellee would have been left to its scant remedy against the forger.
Appellant chose, however, to sue the collecting bank directly. The issue is whether or not such a direct action must yield the same result as that more certainly obtainable in an action either against the drawee banks, or the drawers, appellant's customers. Based upon our analysis of the applicable Code provisions, we must answer in the negative.
Appellant's action below was for conversion, under § 673.419, Fla. Stat. (1975), UCC § 3-419 (1962):
(1) An instrument is converted when: ...
(C) It is paid on a forged indorsement.
The section is followed by Official Comments, which were submitted by the drafters of the Code to aid in uniform construction, and in coherent integration with other sections. Uniform Laws Annotated, UCC III, LXIII. Appellee's liability for conversion by payment on forged instruments seems clear by reference to subsection (1)(c), above, and doubly so by reference to its Comment:
[P]ayment on a forged indorsement . ., even though made in good faith [,] . . is an exercise of dominion and control over the instrument inconsistent with the rights of the owner, and results in liability for conversion.
Comment 3 to UCC § 3-419(1)(c) (1962), § 673.419, Fla. Stat. (1975).
The validity of such an easy conclusion is cast in serious doubt by the terms of subsection (3), through which appellee seeks to exculpate itself:
(3) Subject to the provisions of this code concerning restrictive indorsements a representative, including a depositary or collecting bank, who has in good faith and in accordance with the reasonable commercial standards applicable to the business of such representative dealt with an instrument or its proceeds on behalf of one who was not the true owner is not liable in conversion or otherwise to the true owner beyond the amount of any proceeds remaining in his hands.
A determination of whether appellee collecting bank may properly avail itself of subsection (3) defenses turns on a construction of its terms.
Recourse to Florida precedent indicates that the applicability of the subsection (3) defense to facts such as those sub judice has been assumed, without challenge, until now. See FDIC v. Marine National Bank of Jacksonville, 431 F.2d 341 (5th Cir.1979); Pan American Bank of Orlando v. Yanow, 372 So.2d 1126 (Fla. 4th DCA 1979); Dade County v. Florida Mining and Material Corp., 364 So.2d 31 (Fla.3d DCA 1978); Siegel Trading Co., Inc. v. Coral Ridge National Bank, 328 So.2d 476 (Fla. 4th DCA 1976); Keane v. Pan American Bank, 309 So.2d 579 (Fla.2d DCA 1975); Robert A. Sullivan Construction Co., Inc. v. Wilton Manors National Bank, 290 So.2d 561 (Fla. 4th DCA 1974); Messeroff v. Kantor, 261 So.2d 553 (Fla.3d DCA 1972). See generally Murray, Commercial Law, 31 U.Miami L.Rev. 895, 916-17 *1061 (1977); Murray, Commercial Law, 30 U.Miami L.Rev. 63, 92-93 (1975). Courts of other jurisdictions have, however, closely analyzed its terms.
Judicial application of subsection (3) to suits by a payee against a collecting bank has been strict. Courts generally have held that collecting banks have not qualified for the defense, either because of bad faith or through commercially substandard action. See, e.g., Berkheimers, Inc. v. Citizens Valley Bank, 270 Or. 807, 529 P.2d 903 (1974); Belmar Trucking Corp. v. American Trust Co., 65 Misc.2d 31, 316 N.Y.S.2d 247 (Civ.Ct. 1970); Salesman v. National Community Bank of Rutherford, 102 N.J. Super. 482, 246 A.2d 162 (Super.Ct. Law Div. 1968), aff'd 105 N.J. Super. 164, 251 A.2d 460 (Super.Ct. App.Div. 1969).
Most jurisdictions have at least nominally recognized the impact of subsection (3) to facts such as ours. However, several courts, most notably in California and Pennsylvania, have held that, by its terms, subsection (3) does not apply to suits by payees against depositary/collecting banks for payment of checks bearing forged endorsements.
In Ervin v. Dauphin Trust Co., 84 Dauph. 280, 38 Pa. D. & C.2d 473 (C.P. 1965), it was held that payment on a check was not payment of "proceeds", as the term is used in subsection (3). Rather, such payment constitutes an extension of provisional credit to the customer by reduction of the bank's cash-on-hand; only when the check is collected from the drawee bank does the collecting bank hold "proceeds." Thus, according to this argument, since the collecting bank paid out its own cash, and not "proceeds," it must remit to the payee such remaining "proceeds," as required by the terms of subsection (3).
The Ervin court posited an alternative reason for its rejection of subsection (3) applicability: Where the check is cashed, the bank is not acting as a "representative," rather, it has in fact purchased the check. Since the bank is not a representative, subsection (3) does not come into play.
While these basic themes, with varying elaborations, have found judicial acceptance in other jurisdictions, we remain unconvinced.
The former argument, regarding "proceeds", fails on our facts. The record reflects that the payments in question were not made until the process of collection was completed; thus, the transfer was made from actual "proceeds."
In any event, we find no evidence that such a strained construction of the term "proceeds" was intended by the drafters of the Code. To the extent that a distinction is drawn regarding the time of payment vis a vis the time of collection, such a distinction is artificial; to the extent no distinction is made, the provision is rendered nugatory. Such an intent could not have been intended.
The alternative argument of Ervin and Cooper, supra, regarding the term "representative," is more inviting.
"`Representative' includes an agent, . . or any other person empowered to act for another." § 671.201(35), Fla. Stat. (1975), UCC § 1-201(35) (1962). And until the process of collection is completed, a collecting bank is indisputably an agent of its customer. § 674.201, Fla. Stat. (1975), § 4-201 (1962). When the collection is finally made, the bank becomes a debtor. Comment 4 to § 674.201, § 4-201. At that point, the bank is no longer a "representative," and the subsection no longer applies.
This construction suffers from the same deficiency as does the argument regarding "proceeds": There is simply no reason to suppose that such an interpretation was intended by the drafters of the Code. By so reading subsection (3), we would limit the availability of the defense to that period of time necessary to effect collection on the checks; once collection were completed, the defense would disappear, because the bank would cease to act as an agent. We cannot conceive of a justification for such a "springing liability," especially where based upon a transmogrification specifically disavowed by Comment 1 to § 674.201, Fla. Stat. (1975), UCC § 4-201 (1962), from which the *1062 distinction is drawn. Absent such a justification, or a much clearer expression of intent, we will not endorse that construction.
The one point of universal agreement with regard to subsection (3) is that it is one of the most ambiguous provisions in the Code. Thus, the most believable argument against its application to the facts sub judice does not consist in definitional hair-splitting; rather, it is arguable that subsection (3) was intended to apply to an entirely separate situation, and that it was drawn more broadly than was intended.
The earliest ancestor of subsection (3) appeared in the May 1949 Draft of Article 3:
A representative who in good faith has dealt with an instrument or its proceeds is not liable for conversion even though his principal was not the owner of the instrument.
ALI & National Conference of Commissioners on Uniform State Laws, Uniform Commercial Code § 3-427 (May 1949 Draft). The purpose of the section was avowed to be adoption of
the rule of decisions which have held that a broker who sells a negotiable instrument for his principal in good faith, and in good faith turns over the proceeds to the principal, is not liable for conversion of the instrument. Its negotiable character protects him as it protects the purchaser in due course.
Id., and Official Comment.
The November 1951 Draft contained the changes which comprise the present subsection (3). Thus, it was at that juncture that a provision protecting brokers of negotiable securities from liability to the true owners of those securities was grafted onto the provisions relating to payment on forged endorsements, with the inclusion of the phrase "including a depositary or collecting bank." At that juncture, the Official Comment relating to the provision read much as it does today (Comment 5):
Subsection (3), which is new, is intended to adopt the rule of decisions which has held that a representative, such as a broker or depositary bank, who deals with a negotiable instrument for his principal in good faith is not liable to the true owner for conversion of the instrument or otherwise, except that he may be compelled to turn over to the true owner the instrument itself or any proceeds of the instrument remaining in his hands.
It appears that, at that time, subsection (3) was still intended to apply solely to brokers, including banks acting as brokers, of negotiable securities. This is seen from the language which purports to derive the provision from the "rule of decisions": The common law created a clear remedy for a payee against a collecting bank which paid a check on a forged endorsement, See, e.g., Lindsley v. First National Bank of Philadelphia, 32 Pa. 393, 190 A. 876 (1937); National Union Bank of Maryland v. Miller Rubber Co. of New York, 148 Md. 449, 129 A. 688 (1925); United States Portland Cement Co. v. United States National Bank of Denver, 61 Colo. 334, 157 P. 202 (1916), so whatever subsection (3) applied to, it was not banks acting in their normal banking capacity.
Thus, the dispositive question: Was the inclusion of subsection (3), as it appeared in the Final 1962 Draft (from which our statute is derived), intended to change the common law by removal of a remedy of the payee in instances of good faith, commercially responsible banking activity?
We must answer in the affirmative, because of the language of Comment 6 to § 673.419, UCC § 3-419:
The provisions of this section are not intended to eliminate any liability on warranties of presentment and transfer (Section 3-417). Thus a collecting bank might be liable to a drawee bank which had been subject to liability under this section, even though the collecting bank might not be liable directly to the owner of the instrument.
Faced with the reasonably clear intention of the drafters of the Code,[1] our sole remaining *1063 task is the choice between following what appears to be bad law, or "adapting" that law to what we perceive to be commercial reality, as some other states' courts have done.
Our role commands adherence to lawful legislative decree. A judicial assay into lawmaking is inappropriate; moreover, the false assumption of power to do so diminishes public respect for our lawful authority, which is essential to a government of laws.
We believe that the laws of commerce would benefit by the absence of § 673.419(3), Fla. Stat. (1980), UCC § 3-419(3) (1962). Certainly, Florida payees would so benefit, since collecting banks are nearly always accessible in state courts: By direct action, a single and convenient determination of rights could be effected. The impact of the provision is to create the need for as many actions as there are drawers or drawee banks, many of which may be foreign, especially where a payee's business is interstate in nature. Moreover, to the extent such drawees do not absorb their losses or negotiate a settlement with the collecting bank, they may well have to undertake distant litigation (here) against the collecting bank. Presumably, even a recalcitrant collecting bank would often prefer a single adjudication of liability than defend several suits for parts of the whole. The only possible advantage to subsection (3) is that it allows the banking community to conduct whatever customary resolution of accounts it has evolved for the spreading of risks. Absent a showing to the Legislature that such customary resolution results in a net state societal gain, via benefit to the banking community, over the known disadvantages-mainly, high costs of collection-to payees and drawers, we perceive the statutory provision to have been ill-conceived, as engendering a landslide of litigation inconsistent with the basic thrust of the Code toward simplification of commercial practice and remedy. § 671.102(2)(a), Fla. Stat. (1975), UCC § 1-102(2)(a) (1962).
It is the law, nonetheless, and we are bound by its terms. Thus, we affirm.
Affirmed.
NESBITT, Judge (specially concurring):
I concur in the result because I find the Bank was entitled to assert the defense of good faith under Section 673.419(3), Florida Statutes (1975).
NOTES
[1] Why the common law was abrogated in subsection (3) is not clear. The doctrine of a collector's ultimate responsibility to a true payee for payment on a forged endorsement was an element of the laws of commerce from as early as 1607. Pragmatica III de Litteris Cambii, Nov. 8, 1607, art. 14. European Continental adoption of the 1931 and 1932 Geneva Uniform Codes on Bills of Exchange and Checks effected a general divergence between the Continental and Anglo-American laws mercantile on this point. The Geneva Codes' absolvance from liability of bona fide endorsees was itself derived from the German law. Preussisches Landrecht of 1794, II 8 §§ 835, 1156, 1169; Allgemeine Deutsche Wechselordnung of 1848, arts. 36, 74, 76. Whether subsection (3) defenses reflect the influence of the Geneva Codes, or whether they merely suggest that bankers were "doubtless at work in the drafting of Section 3-419(3) ...", J. White & R. Summers, Handbook on the Law Under the Uniform Commercial Code 505 (1972), is an open question.