Accordingly, the judgment of conviction and the sentence imposed thereon are reversed.

STEVE KNESZ, PLAINTIFF-APPELLANT, v. THE CENTRAL JERSEY BANK AND TRUST CO. OF FREEHOLD, A NEW JERSEY CORPORATION, DEFENDANT-RESPONDENT, v. CERRATO, O'CONNOR, MEHR & SAKER, A PROFESSIONAL CORPORATION, THIRD-PARTY DEFENDANT-RESPONDENT.

Superior Court of New Jersey
Appellate Division

Argued October 26, 1982—Decided November 24, 1982.

Before Judges MICHELS, PRESSLER and TRAUTWEIN.

*Frederick R. Stem* argued the cause for appellant (*Stem and Stem*, attorneys).

*Donald J. Rapson* argued the cause for defendant-respondent The Central Jersey Bank and Trust Co. of Freehold (*Lautman, Rapson, Henderson & Mills*, attorneys and special counsel to

*McCue & McCue,* and cocounsel for third-party defendant Cerrato, O'Connor, Mehr & Saker).

*Richard A. Admur,* attorney for third party defendant Cerrato, O'Connor, Mehr & Saker, filed a brief on its behalf.

The opinion of the court was delivered by

PRESSLER, J.A.D.

The issue raised by this appeal, unaddressed in this State since its adoption of the Uniform Commercial Code, *N.J.S.A.* 12A:1–101 *et seq.,* is whether the payee of a check whose indorsement has been forged has a cause of action in conversion against the depositary-collecting bank which has paid on the forged indorsement. We hold that *N.J.S.A.* 12A:3–419(3), relied on by defendant bank, does not immunize it from a conversion action by the payee and hence that the Code does not deprive the payee of the common-law conversion action theretofore available to him. Accordingly, we reverse the summary judgment entered in defendant bank's favor and remand for trial.

The facts giving rise to this action are basically undisputed insofar as they implicate the viability of plaintiff-payee's cause of action in conversion against defendant, the depositary and collecting bank. Plaintiff Steve Knesz was the nonoccupant owner of a cooperative apartment in New York City. He employed a New York attorney, Thomas G. Moringiello, who has since been disbarred, to act as his rental agent. It appears that Moringiello did not regularly transmit rental proceeds to plaintiff since the amount of the rent did not exceed the disbursements required to be made for taxes, mortgage amortization and maintenance expenses. In any event, in March 1979 Moringiello, without plaintiff's knowledge or authority, sold the apartment to Lois Gartlir. She paid the purchase price by way of five checks drawn on three different banks and totaling $32,651. Four of these checks, three drawn on Morgan Guaranty Trust Company of New York and one drawn on Bankers Trust, were payable to the order of Gartlir who, in turn, endorsed them

under the legend "pay to the order of Steve Knesz." The fifth was a bank check of Citibank, N.A., payable to plaintiff's order. Moringiello forged plaintiff's indorsement on all five instruments. He apparently deposited three of the checks payable to Gartlir to his own account in Citibank, N.A., which ultimately repaid plaintiff.

Thus, the controversy involves only two instruments, a check drawn on Morgan Guaranty payable to Gartlir in the amount of $5,000 and the Citibank check payable to plaintiff in the amount of $16,974.24. These two checks were delivered by Moringiello to a New Jersey attorney, James E. Collins, under the following circumstances. Moringiello at the time of this transaction was representing other clients in connection with their sale of a residence in Staten Island. Collins fortuitously represented the same people in connection with their purchase of a residence in Monmouth County, New Jersey. The proceeds of the Staten Island sale were intended to be applied to the New Jersey purchase and, in accordance with this plan, Moringiello sent Collins a check drawn on his "special attorney account" in the amount of $24,000 purportedly representing the sales proceeds. Collins deposited this check into the trust account maintained by his firm, Cerrato, O'Connor, Mehr & Saker (firm) in the Central Jersey Bank and Trust Co. of Freehold (Central Jersey). Moringiello's attorney's check was returned for insufficient funds, and Collins made demand upon Moringiello for the immediate replacement of his bad check. Moringiello obliged by turning over to Collins the two checks on which he had forged Knesz's indorsement, placing his own indorsement immediately below Knesz's forged signature. He added to these another check drawn by him on his attorney's account making up the difference between Knesz's $21,974.24 and the required $24,000. Collins indorsed all three instruments and deposited them in the firm's account in Central Jersey. The collection process proceeded and was completed in due course.

Some nine months later, in January 1980, plaintiff first learned of the unauthorized sale of the apartment. He appar-

ently chose to ratify the sale and seek recovery of the proceeds. With the gratuitous assistance of yet another bank, he finally obtained the necessary information regarding the five instruments, and in August, 1980 he executed affidavits of forgery as to each. As noted, Citibank paid him the amount of the three checks Moringiello had deposited to his account there. Central Jersey refused to pay, however, on the two checks as to which it was both depositary and collecting bank. Plaintiff consequently brought this action against the bank, which filed a third-party complaint against the firm.

Both plaintiff and the bank moved for summary judgment. Plaintiff took the position that the bank, having paid on a forged instrument, was absolutely liable to him in conversion. The bank cross-moved for summary judgment. Its theories of defense included the claims that the bank was not liable in conversion pursuant to the terms of *N.J.S.A.* 12A:3–419(3); that plaintiff had been negligent and hence was foreclosed from recovery by *N.J.S.A.* 12A:3–406, and finally, that in ratifying Moringiello's sale of the apartment, plaintiff also necessarily ratified Moringiello's disposition of the proceeds thereof. It was on the basis of *N.J.S.A.* 12A:3–419(3) that plaintiff's motion was denied and the bank's motion granted. We agree with plaintiff that the trial judge erred in his construction of this section.

*N.J.S.A.* 12A:3–419(1)(c) states with unmistakable clarity that "an instrument is converted when . . . it is paid on a forged indorsement." *N.J.S.A.* 12A:3–419(3), which poses the constructional problem here, provides in full as follows:

Subject to the provisions of this Act concerning restrictive indorsements a representative, including a depositary or collecting bank, who has in good faith and in accordance with the reasonable commercial standards applicable to the business of such representative dealt with an instrument or its proceeds on behalf of one who was not the true owner is not liable in conversion or otherwise to the true owner beyond the amount of any proceeds remaining in his hands.

Thus, the question is whether a depositary or collecting bank, when it engages in the customary business of accepting checks for cash payment or ordinary collection, is entitled to the statutory immunity from conversion liability afforded by § 3–419(3).

We note preliminarily that this is a question which has generated substantial controversy among those courts and commentators who have addressed it and who apparently are unanimous in their conclusion that there is neither commercial nor practical nor rational justification for construing it as applicable to depositary and collecting banks engaging in normal check collection business. Consequently, the section has either been ignored altogether, applied reluctantly, or held inapplicable on a variety of theories. For the reasons hereafter stated we agree with those courts which have concluded that the section does not apply in this situation but we reach that conclusion on grounds somewhat different from those heretofore articulated.

Our beginning point is pre-Code common law, which virtually universally recognized the right of the payee whose indorsement was forged to recover on theories of conversion, contract or money had and received directly against the depositary-collecting bank which paid on the forged indorsement. *See* the leading case of *Buckley v. Second National Bank of Jersey City,* 35 *N.J.L.* 400 (Sup.Ct.1872). *See, also, American Saw Co. v. First National Bank,* 58 *N.J.L.* 438 (Sup.Ct.1896), rev'd o.g. 60 *N.J.L.* 417 (E. & A.1897); *Passaic-Bergen Lumber Co. v. U.S. Trust Co.,* 110 *N.J.L.* 315 (E. & A.1933). *And see* the post-Code decision in *Salsman v. National Community Bank of Rutherford,* 102 *N.J.Super.* 482, 489 (Law Div.1968), aff'd o.b. 105 *N.J.Super.* 164 (App.Div.1969), in which the court, relying on a plethora of cited out-of-state case authority, pointed out that it "has been the established law throughout the country and continues to be the rule in states which have adopted the Uniform Commercial Code" that in "the absence of defenses such as negligence, estoppel or ratification, the payee of a check is entitled to recover against a bank making collection from the drawee based on a forged or unauthorized indorsement of a check." *See, also, Thermo Contracting Corp. v. Bank of N.J.,* 69 *N.J.* 352, 359 (1976), a post-Code decision of the Supreme Court which assumed that collecting and paying banks are *prima facie* liable to

a payee whose indorsement is forged or unauthorized. See, also, cases collected in Annotation, "Right of Check Owner to Recover Against One Cashing It on Forged or Unauthorized Indorsement and Procuring Payment by Drawee," 100 *A.L.R.*2d 670 (1965).

The common law right of action by the payee against the depositary-collecting bank rests, of course, upon sound and established principles dependent upon the legal fact that neither the forger of the indorsement nor those taking through him have title to the instrument and hence that the payee or last genuine indorser remains its owner. The check owner's right of direct action against the depositary-collecting bank is also recognized as resting upon sound considerations of public policy as well. First, the loss is appropriately placed upon the depositary bank since it has dealt most immediately with the forged instrument and consequently has the best as well as the last opportunity to have avoided the loss. Second, since the depositary bank is the most immediately connected with the transaction involving the forged instrument, it is, in most situations, in the best position to raise the traditional defenses of negligence, estoppel and ratification. Finally, it is the depositary bank upon which, as a consequence of the normal operation of the collection system, the loss will in any event be ultimately placed since, as a consequence of their respective indorsement warranties, each bank in the collection chain, from drawee to depositary, has a right to look to its own transferor for recovery.[1] *See, e.g., Cooper v. Union Bank,* 9 *Cal.*3d 371, 107 *Cal.Rptr.* 1, 507 *P.*2d 609, 616–617 (Sup.Ct.1973); *Sherriff-Goslin Co. v. Cawood,* 91 *Mich.App.* 204, 283 *N.W.*2d 691, 693–694 (Ct.App.1979); *Denn v. First State Bank of Spring Lake Park,* 316 *N.W.*2d 532, 537 (Minn.Sup.Ct.1982); *Mississippi B. & T. Co. v. County Sup. &*

---

[1]This right over has been codified by the Code, *N.J.S.A.* 12A:4–207, which specifies the warranties undertaken by each customer or collecting bank obtaining payment or acceptance of an item. Among them is the warranty of good title. *N.J.S.A.* 12A:4–207(1)(a) and (2)(a).

*Diesel Serv., Inc.,* 253 *So.*2d 828, 831 (Miss.Sup.Ct.1971); *Jackson Vitrified China v. People's American,* 388 *So.*2d 1059, 1062–1063 (Fla.D.Ct.App.1980). *And see, generally,* White & Summers, *Uniform Commercial Code* (2 ed. 1980), at 589–594.

If *N.J.S.A.* 12A:3–419(3) is construed as applying to the normal and customary check collection business of a depositary and collecting bank, then by the terms of that provision its liability in "conversion or otherwise" to the payee of the check whose indorsement has been forged will be limited to those situations in which the bank has acted either in bad faith or contrary to a reasonable commercial standard, and to those situations in which it still has the proceeds of the check available to it because of the pendency of the collection process. Unless one of these liability-triggering elements is available to the payee, he will be unable to proceed directly against the depositary-collecting bank. Rather, his remedy will be against the drawer of the check or the drawee bank. The drawer will then look to the drawee and the drawee, as noted, will have the right to recover successively against its transferor, who in turn will look to its transferor until ultimately, the loss will be borne by the depositary bank. The effect of *N.J.S.A.* 12A:3–419(3), therefore, would be in no way to immunize the depositary bank from the consequences of its payment on a forged indorsement. It undertakes that liability by the mere act of sending the check through for collection. All that such a construction of *N.J.S.A.* 12A:3–419(3) would therefore accomplish would be the replacement of a single direct action by a circuity of action. If the depositary bank and the payee are in the same jurisdiction and the drawee-payor bank is in another jurisdiction, as is typical, that construction of *N.J.S.A.* 12A:3–419(3) would also have the effect of prejudicing the recovery opportunity of the payee, who would be forced to go elsewhere to sue. Furthermore, the raising and litigating of defenses based on the payee's culpability are ordinarily most effectively accomplished by the bank closest to the

transaction, and customarily this is the depositary rather than the drawee bank.[2]

The question, then, is whether the framers of the Code and the New Jersey Legislature intended by enactment of § 3:419(3) to abrogate a common law principle which is legally sound, commercially practical and judicially expeditious, and to replace it, not by altering the allocation of ultimate liability, but only by limiting the remedy of the wronged party in a manner which is inevitably circuitous, cumbersome, burdensome and impractical. We conclude that this was neither the legislative intention nor the legislative prescription.

As we have noted, the apparent anomaly of § 3–419(3) in this context is by now a well-recognized phenomenon. As early as 1964 it was held to be inapplicable to the normal check collection activities of banks. *Ervin v. Dauphin Deposit Trust Co.,* 38 *Pa.D. & C.2d* 473 (C.P.1964). The court in *Ervin* relied, first, on legislative history, noting that the Official Comment on this section (Comment 5 on § 3–419) does not evince an intention to abrogate the common law. That Comment reads in full as follows:

Subsection (3), which is new, is intended to adopt the rule of decisions which has held that a representative, such as a broker or depositary bank, who deals with a negotiable instrument for his principal in good faith is not liable to the true owner for conversion of the instrument or otherwise, except that he may be compelled to turn over to the true owner the instrument itself or any proceeds of the instrument remaining in his hands. The provisions of subsection (3) are, however, subject to the provisions of this Act concerning restrictive indorsements (Sections 3–205, 3–206 and related sections).

The court in *Ervin* concluded that the operative term "representative," by expressly including a "broker," was not intended

---

[2]*Cf. Western Union Tel. Co. v. Peoples Nat'l Bk., Lakewood,* 169 *N.J.Super.* 272 (App.Div.1979), a case dealing with the right of action of a drawer rather than a payee. There the drawer was denied the right of direct action against the depositary-payor on the ground that the proximate cause of its loss was the drawee's improper handling of its account. Despite the circuity of action thus created, the court noted that the drawee is in the best position to raise Code defenses against the drawer based upon the drawer's own negligence and failure to inspect its statements.

in its reference to a depositary or collecting bank as a possible representative, to include such a bank acting simply as the acceptor of a check for collection or as the payor of a check to be transmitted by it for collection. Alternatively, *Ervin* held that since the bank there had cashed the check for the customer, it had used its own funds, and the "proceeds" of the check received by it through the collection process remained thereafter in its hands, available to the payee by the explicit terms of § 3–419(3). Both of these theories were thereafter elaborated upon by the California Supreme Court in *Cooper v. Union Bank, supra,* 107 *Cal.Rptr.* 1, 507 *P.2d* 609, which also rejected the applicability of § 3–419(3) to depositary banks acting in a check-collection function. Noting the unlikelihood that the Code's framers would have intended to so radically depart from the common law without making some comment either acknowledging or explaining that departure,[3] the California court reasoned that for purposes of § 3–419(3), whether the depositary bank has cashed the forged check or has merely accepted it for collection, it never actually pays over the "proceeds" within the intendment of that section if it pays on a forged indorsement to one who is not entitled thereto. *Cooper* further relied on the conclusion, reinforced by its own state's study comments on the Code, that "representative," as used by § 3–419(3), was intended only to protect investment brokers, those acting as investment brokers, and other "true agents." 107 *Cal.Rptr.* at 10, 507 *P.2d* at 618.

*Ervin* and *Cooper* generated considerable commentator response, the consensus of which was that there was little justification, if any, for generally immunizing a depositary bank from

---

[3] Of singular interest in this regard is the apparent contemporaneous perception of at least one leading commentator that § 3–419(3) did not alter the common law rule. Thus, in 2 *Anderson, Uniform Commercial Code* (1971), the author, after a perfunctory reference to the section at 1033, makes this observation: "Where the name of the indorsee is forged, a bank which collects the check bearing such forgery and credits the proceeds to the account of the forger commits conversion and is liable to the person who was the lawful holder prior to the forged indorsement." *Id.* at 1037.

direct liability to the owner of a check which was paid by it on a forged indorsement; that the Code apparently did not intend such a result, but that the reasoning of both *Ervin* and *Cooper* was nevertheless strained. See, *e.g.* Note, "Cooper v. Union Bank: California Protects the True Owner Against a Forged Indorsement Despite Uniform Commercial Code Section 3–419(3)," 25 *Hastings L.J.* 715 (1974); Note, "Depositary Bank Liability under § 3–419(3) of the Uniform Commercial Code," 31 *Wash. & Lee L.Rev.* 676 (1974); Note, "Payee v. Depositary Bank: What is the UCC Defense to Handling Checks Bearing Forged Indorsements?" 45 *U.Colo.L.Rev.* 281 (1974); Recent Developments, "Section 3–419(3) of the U.C.C. Does Not Limit the Liability of a Depositary Bank to the True Owner of a Check Paid on a Forged Indorsement," 74 *Colum.L.Rev.* 104 (1974).

The judicial response to *Ervin* and *Cooper* is even more instructive. Virtually all courts which have had to address § 3–419(3), whether or not they have finally opted to apply that section to a depositary bank which has paid on a forged check indorsement, have expressly failed to find any policy justification for such an immunity. Among the most thoughtful and carefully analytical of the opinions which have nevertheless accorded the section a broad immunity construction are *Jackson Vitrified China v. People's American*, 388 *So.2d* 1059 (Fla.D.Ct. App.1980), and *Denn v. First State Bank of Spring Lake Park, supra*, 316 *N.W.2d* 532 (Minn.Sup.Ct.1982). Both did so reluctantly. The Florida court, in *Jackson Vitrified China v. People's American, supra,* pertinently observed:

> Why the common law was abrogated in subsection (3) is not clear. The doctrine of a collector's ultimate responsibility to a true payee for payment on a forged endorsement was an element of the laws of commerce from as early as 1607. [388 *So.2d* at 1062–1063, n. 1; citations omitted]

It had this to say as well:

> We believe that the laws of commerce would benefit by the absence of § 673.419(3), Fla.Stat. (1980), UCC § 3–419(3) (1962). Certainly, Florida payees would so benefit, since collecting banks are nearly always accessible in state courts: By direct action, a single and convenient determination of rights could be effected. The impact of the provision is to create the need for as many actions as there are drawers or drawee banks, many of which may be foreign,

especially where a payee's business is interstate in nature. Moreover, to the extent such drawees do not absorb their losses or negotiate a settlement with the collecting bank, they may well have to undertake distant litigation (here) against the collecting bank. Presumably, even a recalcitrant collecting bank would often prefer a single adjudication of liability than defend several suits for parts of the whole. The only possible advantage to subsection (3) is that it allows the banking community to conduct whatever customary resolution of accounts it has evolved for the spreading of risks. Absent a showing to the Legislature that such customary resolution results in a net state societal gain, via benefit to the banking community, over the known disadvantages—mainly, high costs of collection—to payees and drawers, we perceive the statutory provision to have been ill-conceived, as engendering a landslide of litigation inconsistent with the basic thrust of the Code toward simplification of commercial practice and remedy. [388 *So.*2d at 1063]

The Minnesota court noted that

There are strong policy arguments in Denn's favor. It is judicially efficient to allow the true payee to proceed directly against a collecting bank. The collecting bank will bear the ultimate loss in most cases. If the payee must sue the drawee bank, the drawee bank will sue the collecting bank on the warranties of Minn.Stat § 336.4–207 as Northfield did in this case. Therefore, "a suit by the owner-payee against the depositary bank avoids an additional suit and thus resolves the entire dispute in a more economical manner." J. White & R. Summers, Uniform Commercial Code 590 (2d ed 1980). Collecting banks are also more convenient defendants. While the forged checks may be drawn on several different banks, the forger often cashes or deposits them all at the same bank, or at banks in the same geographical area. Both the payee and the judicial system suffer when the payee is required to sue the drawee banks in a number of jurisdictions to recover on a forged indorsement. The Michigan Court of Appeals relied on this policy consideration when it held that "3–419(3) provides no defense for the collecting bank in a suit by the true owner of the instrument in this type of fact situation." *Sherriff-Goslin Co. v. Cawood,* 91 Mich.App. 204, 210, 283 N.W.2d 691, 694 (1979). The court was concerned about the number of suits that would result if it did not allow a payee's direct action against a depositary bank. [*Denn v. First State Bank of Spring Lake Park, supra,* 316 *N.W.*2d at 537]

Nevertheless, both courts concluded that the reasoning of *Ervin* and *Cooper* constituted an inadequate basis for overcoming the apparent plain meaning of the section.

Other courts, however, have been willing to conclude, whether or not they accept the *Ervin-Cooper* rationales, that in view of the common law precedents and the strong public policy arguments against immunity, the immunity intent of the Code is simply too improbable to warrant judicial enforcement. They have accordingly refused to apply the section to depositary and

collecting banks paying on forged indorsements. *See, e.g., Tubin v. Rabin,* 389 *F.Supp.* 787 (N.D.Tex.1974), aff'd 533 *F.2d* 255 (5 Cir.1976); *Sherriff-Goslin Co. v. Cawood, supra,* 91 *Mich.App.* 204, 283 *N.W.2d* 691 (Ct.App.1979). Still other courts have avoided the immunity consequence by a strict construction of the exception based on failure to comply with a reasonable commercial standard. *See, e.g., Salsman v. National Community Bank of Rutherford, supra,* 102 *N.J.Super.* 482; *Continental Bank v. Wa-Ho Truck Brokerage,* 122 *Ariz.* 414, 595 *P.2d* 206 (Ct.App.1979); *Berkheimers, Inc. v. Citizens Valley Bank,* 270 *Or.* 807, 529 *P.2d* 903 (Ore.Sup.Ct.1974); *Tette v. Marine Midland Bank,* 78 *App.Div.2d* 383, 435 *N.Y.S.2d* 413 (App.Div.1981); *Aetna Cas. & Sur. Co. v. Hepler State Bank,* 6 *Kan.App.2d* 543, 630 *P.2d* 721 (Kan.Ct.App.1981); *Yeager and Sullivan, Inc. v. Farmers Bank,* 162 *Ind.App.* 15, 317 *N.E.2d* 792 (Ind.Ct.App. 1974); *Thornton & Co. v. Gwinnett Bank & Trust Co.,* 151 *Ga.App.* 641, 260 *S.E.2d* 765 (Ct.App.1979). *Cf. Beyer v. First Nat'l Bank of Dillon,* 612 *P.2d* 1285 (Mont.Sup.Ct.1980); *Peoples Life Ins. Co. of S.C. v. Community Bank,* 292 *S.E.2d* 188 (S.C. Sup.Ct.1982); *Mott Grain Co. v. First Nat'l Bank & Trust Co.,* 259 *N.W.2d* 667 (N.D.Sup.Ct.1977). And, finally, despite the adoption of the Code by their states, some courts have applied the common law rule and accorded a right of direct action against the depositary-collecting bank under § 3–419(1)(c) without any reference at all to § 3–419(3). *See, e.g., Peoples Nat'l Bank v. American Fidelity Fire Ins.,* 39 *Md.App.* 614, 386 *A.2d* 1254 (Ct.App.1978); *Equipment Distrib. v. Charter Oak Bank, etc.,* 34 *Conn.Supp.* 606, 379 *A.2d* 682 (Super.Ct.1977);

█ New Jersey courts have not yet had to face this problem. The question of general applicability of § 3–419(3) was not addressed in *Salsman v. National Community Bank of Rutherford, supra,* 102 *N.J.Super.* 482, since the depositary bank there was held not to have conformed to a reasonable commercial standard and hence would not in any event have been entitled to any immunity from a payee's suit afforded by the section. Here, we agree with the trial judge that the conduct of the bank

was *prima facie* in accord with a reasonable commercial standard and that plaintiff made no showing which might raise a question of fact with respect thereto. We are satisfied that the bank was perfectly justified in accepting the checks with its own depositor's indorsement. While it is true that Moringiello himself was one of the prior indorsers and that the bank constructively knew that Moringiello had drawn a previous check payable to its customer on insufficient funds, we do not conclude that the bank was obligated by that circumstance to inquire into every subsequent instrument presented to it which was indorsed by Moringiello, particularly since that indorsement and all prior indorsements were effectively guaranteed to it by virtue of its customer's own and final indorsement. Having concluded that there was no question of fact impugning the bank's adherence to the required reasonable commercial standard, we are perforce constrained to address the question of the general applicability of § 3–419(3).

■ In concluding that that section does not apply to depositary or collecting banks engaging in customary check payment and collection activities, we are in full accord, for the reasons we have already stated, with both the judicial and commentator expressions of the public policy concerns militating against immunity. We recognize however, that our view of salutary public policy may not override or contravene the Legislature's expressed view and that if the Legislature had indeed expressly elected to abrogate the common law, we would be obliged to enforce that election. It is, however, our conviction, based both on legislative history and textual considerations, that our Legislature did not so intend.

With respect to legislative history, we agree with the perception of the California court in *Cooper v. Union Bank, supra,* that the Code drafters would have been unlikely to have substantially effected a change in well-settled common law without comment. More to the point, however, is the New Jersey Study Comment on the section. That Comment states, in its entirety,

that § 3–419(3) and § 3–419(4) "are new provisions on which no New Jersey law has been found." As we have noted, New Jersey law, for over a century, has accorded the payee a direct right of action in conversion against a depositary-collecting bank which has paid a check on a forged indorsement. It is, therefore, evident that in its review of this section of the Code, the framers of the study comment could not have concluded that it was this principle which was being affected thereby. They must be assumed, therefore, to have believed that the section impacted upon some other legal principle or problem which had not been theretofore addressed in this jurisdiction.

There is, moreover, convincing evidence to believe that the sole problem which was apparently being addressed by § 3–419(3) and the problem which the New Jersey Commission to Study and Report Upon the Uniform Commercial Code [4] believed was being addressed was that of the liability of persons acting as brokers in negotiating the sale of securities. A comprehensive review of the legislative history of this section of the Code, starting with the 1948 Draft, undertaken by the author of the *Colorado Law Review* Note, *supra* at 308–311, traces the broker problem as the real concern of this section and concludes that

> ... the intent of the drafters from the outset was to resolve a particular problem area of the law as to whether persons acting as brokers in negotiating the sale of securities should be liable under the ordinary rules of conversion if they had no knowledge that the securities were stolen. The drafters evidently decided to adopt cases which held that "agents" or "representatives" who act as mere go-betweens as to seller and buyer should not have to face conversion liability on these noncash items. On the one hand, negotiability of such items does not depend upon indorsement so that the risk of taking stolen securities is much greater than on checks. On the other hand, such agents are already under a higher duty of care to act as trustee for any proceeds of sale of these items and to turn such proceeds over to the principal.

---

[4] See, as to the organization and mandate of the Commission, its Second Report to the Governor, Senate and Assembly, *N.J.S.A.* 12A:1–101 *et seq.*, at XIII. Nothing in this abbreviated discussion on Article III in this report suggests that it contained any substantial deviation from then existing law.

As bankers themselves were "doubtless at work in the drafting of Section 3–419(3)," they probably inserted "including a depositary or collecting bank" after "representative" in order to insure that such banks would not be held liable when acting similarly in the capacity of broker. Unfortunately, the drafters of the Code did not leave this provision in a separate section where it belongs. When it was incorporated as a subsection under Section 3–419, its meaning was inevitably intermingled with the notion of handling .checks bearing forged indorsements. It is probably that the drafters never foresaw the way in which its meaning would get expanded. [*Id.* at 310–311; footnotes omitted]

Other commentators are in agreement with both this historical perspective and its import. See, *e.g.,* Note, *Wash. & Lee L.Rev.; supra* at 680–682. *And see Cooper v. Union Bank, supra,* 107 *Cal.Rptr.* at 10, 507 *P.2d* at 618, suggesting a similar understanding and concern by the California Study Commission.

In view of this historical perspective and its focus on the broker-securities situation, the intended meaning of the Official Comment on § 3–419(3) becomes clear. That Comment, quoted in full *supra,* begins with the statement that the section "is intended to adopt the rule of decisions which has held that a representative, such as a broker or depositary bank, who deals with a negotiable instrument for his principal in good faith is not liable to the true owner for conversion or otherwise . . . ." There was never, however, as heretofore discussed, a "rule of decisions" absolving the depositary bank from liability to the owner of a check which has been paid by the bank on a forged indorsement. To the contrary, the "rule of decisions" expressly and virtually uniformly imposed that liability on depositary banks in that situation, the question of their good faith notwithstanding. In the light of the section's history, it becomes evident then that the "rule of decisions" to which the official Comment referred was, rather, a well established pre-Code common law exception to the general principle that an agent is liable in conversion in respect of property which his principal has no authority to dispose of. The exception was intended to protect an agent who acts in good faith in transferring, on his principal's account, cash or securities which by their nature require only delivery for passage of good title, typically, bearer

instruments. This exception has been codified by 1 *Restatement, Torts* 2d, § 233(4) at 454 (1965), as follows:

The statement in Subsection (1) [general rule of agent liability] is not applicable to an agent or servant who disposes of current money, or a document negotiable by common law or by statute, pursuant to a transaction by which the transferee becomes a holder in due course of such money or document, unless the agent or servant knows or had reason to know that his principal or master does not have authority so to dispose of it.

And see Comment e. on § 233(4), *id.* at 456. This exception is also recognized by 2 *Restatement, Agency* 2d, § 349 at 116 (1958). That section restates the general rule of agent liability for conversion of property to which the principal is not entitled to possession, but Comment g. at 119 explains that the agent is nevertheless protected when he deals in good faith with commercial paper to which title is transferable by delivery alone.

We do not address, since it is not before us, the question as to the extent, if any, of the applicability of § 3–419(3) to dealings in nonbearer commercial paper. See *Hastings L.J., supra* at 724–725. The point is that the immunity was not intended to apply to the routine check collection activities of banks, and the protected "representative" category was not intended to include an agency relationship having no independent existence but which is based, if at all, on a statutory presumption arising exclusively from the collection and handling of checks.

Assuming from all of these indicia that § 3–419(3) was intended only to preserve the common law exception protecting brokers dealing in bearer instruments and was not intended to abrogate the common law in respect of a depositary bank's well settled conversion liability to a payee of a check, we return to the text of § 3–419(3) in order to determine whether it nevertheless compels a construction expanding the immunity to check-collecting depositary banks.

At the outset, we reject the *Cooper* analysis of what is meant by "proceeds." While that analysis may be logically supportable and is certainly creative, we are nevertheless of the view that it is contrary to the common sense, design and import of the

check-collection system. Rather, we find § 3–419(3) inapplicable in this situation because we conclude that a depositary bank functioning within the check collection system is not a "representative" encompassed by that section. First, as heretofore discussed, it was not, as a matter of legislative history, intended to be so encompassed. Nor is it required to be so encompassed by any textual imperatives.

The term "representative" is defined by the Code, *N.J.S.A.* 12:1–201(35), as "an agent, an officer of a corporation or association, or a trustee, executor or administrator of an estate, or any other person empowered to act for another." The argument for inclusion of a depositary or collecting bank within this definition customarily relies on Article 4 of the Code dealing with bank deposits and collections, and more particularly on § 4–201, which provides in pertinent part that

> Unless a contrary intent clearly appears and prior to the time that a settlement given by a collecting bank for an item is or becomes final ... the bank is an agent or sub-agent of the owner of the item and any settlement given for the item is provisional.

The theory, then, is that by the act of accepting a check for collection, the bank constitutes itself an agent, hence a "representative," and hence is entitled to the benefit of § 3–419(3). Indeed, it is this statutorily-created agency status that has led one commentator at least to the conclusion that when a bank accepts a check for collection it is an agent entitled to rely on § 3–419(3), but when it cashes the check "over the counter," it is not within the agency definition of § 4–201 since it would then be a purchaser of the check and would consequently not be entitled to rely on § 3–419(3). See Farnsworth and Leary, "UCC Brief No. 10: Forgery and Alteration of Checks," 14 *Prac.Law.* No. 3, at 75, 79 (1968). We regard this distinction as sophistical in terms both of the text of § 4–201 and the common sense of the transaction. First, there is no practical justification from the perspective of either the payee or the bank for liability to be made to depend on the fortuity of whether the check is

cashed or a credit given by the depositary bank. Moreover, typically the forged indorsement is not discovered until after final settlement when the bank's agency status in respect of that instrument has in any case already terminated. More significantly, however, this distinction is contrary to the text of § 4–201.

As we view it, the key concept of § 4–201 is acceptance by the bank of a check for collection *from the owner*. It is perfectly clear that if an instrument requires indorsement in order for its title to be transferred, title cannot have passed on the basis of a forged indorsement. Therefore, a person tendering such an instrument cannot be deemed to be its owner. As to such an instrument, consequently, the bank is not an agent for the owner when it accepts it for collection from a person who is not the owner. In this context we note that had an agency status been intended by the Code in respect of a forged check, other terminology would easily have accomplished that result, such as use of the word "customer," defined by § 4–104(e) to include any person for whom a bank has agreed to collect an item. It is, moreover, clear that the statutory agency presumption of § 4–201 was intended only to make uniform and to clarify the consequences of bank insolvency during the collection process. See New Jersey Study Comment 1 to *N.J.S.A.* 12A:4–201. It does not appear that there was any intent to transport that statutory agency presumption into the general definition of "representative" for purposes of either § 1–201(35) or § 3–419(3).

We are able to discern no basis, other than § 4–201, for concluding that a depositary bank, in accepting a forged instrument for collection, is acting as an agent. Since § 4–201 predicates agency status on acceptance from an owner, we are persuaded that, in respect of the forged instrument, the bank is not an agent, hence not a representative, and hence beyond the protection of § 3–419(3).

This conclusion explains other apparent anomalies in § 3–419(3). In conferring the immunity from conversion liability, the section speaks in terms of liability to the "true owner." We regard the "true owner" as singular terminology since ordinarily one is either the owner or not the owner. Why, then, the qualification that it is the true owner to whom the representative is not liable in conversion? If § 3–419(3) is understood as intended to codify the common law broker-bearer instrument exception to agent liability, the answer is obvious. Where indorsement of an instrument is not necessary for transfer of title, a *bona fide* transferee of the instrument obtains good title thereto, even if the transfer was not authorized by the prior actual owner—the true owner. *See Santos v. First National State Bank of N. J.,* 186 *N.J.Super.* 52, 73 (1982). It is thus only in the context of such instruments, as to which there can simultaneously be two "owners," that the concept of "true owner" as distinguished from "owner" has relevance. That concept is inapposite to forged checks since a check requiring indorsement for transfer can only have one owner at a time.

Furthermore, by immunizing an agent dealing with bearer instruments, § 3–419(3) effectively affords real immunity from liability since ordinarily the agent would be liable only to the true owner. Extension of that immunity to a bank accepting an instrument with a forged indorsement does not similarly immunize the bank from ultimate liability since it is always in any case responsible to its transferee by reason of its statutory warranties. The immunity would, therefore, not affect liability but only the remedy of the wronged party and would deprive him of a remedy well recognized at common law with no apparent offsetting legitimate advantage to the commercial establishment. This result in our view is aberrational, was not intended, and is not dictated by any policy or provision of the Code.

The summary judgment in favor of defendant is reversed and the matter remanded to the trial court for further proceedings with respect to the Bank's defenses and for prosecution of its third-party complaint.